**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. RWT-11-0091** |
| | : | |
| **WILLIAM CASSIDY** | : | |

**Amicus Curiae Brief in Support of
United States' Opposition to Defendant's Motion to Dismiss**

The National Center for Victims of Crime[1] and Maryland Crime Victims' Resource

Center respectfully submit this *amicus curiae* brief regarding Defendant William Cassidy's

Motion to Dismiss the Indictment with the purpose of informing the Court of the acute public

interest considerations implicated by his argument that 18 U.S.C. §2261(A)(2)(A) violates the

U.S. Constitution.  It is important to the safety and protection of cyberstalking victims to have

the alleged conduct in this case be interpreted as an enforceable violation of federal law.

I.     FACT STATEMENT

Victim 1 is a sixty-one year old woman who holds a high ranking position in an

American religious sect of Tibetan Buddhism.  She was a teacher at the Kunzang Odsal Palyul

Palyou Changchub Choling ("KPC"), a buddhist retreat located in Arizona.  (Exhibit A, *Affidavit*

---

[1] For nearly two decades, the National Center for Victims of Crime has led the field in enhancing our country's response to stalking. Since the enactment of the country's first state stalking law in 1990, the National Center has supported scores of legislators and victim advocates across the country in their efforts to pass state stalking laws or strengthen existing laws. The National Center has also played a pivotal role in shaping federal stalking law by providing technical assistance to lawmakers, commenting on proposed legislation, and testifying before Congress. The National Center was critical in ensuring that legal protections keep pace with technology by advocating that the federal stalking statute include stalking behaviors that occur via the Internet or by other electronic means, such as tracking by GPS. In 2000, the National Center established the Stalking Resource Center, the only national training and technical assistance center focused solely on stalking. The Stalking Resource Center has provided training to tens of thousands of victim service providers and criminal justice practitioners throughout the United States and has fostered innovations in programs for stalking victims and practitioners who support them.

*in Support of Criminal Complaint*, Jessica A. Nye, ¶6).  In and around September 2007,

Defendant William Cassidy ("Cassidy") befriended a monk of KPC with the purpose of gaining

access to Victim 1.  (Exhibit A, ¶6(a)).  Cassidy introduced himself to the monk and the entire

KPC community under a false name, claimed he was dying of lung cancer and that he was a

Buddhist.  Eventually Victim 1 agreed to meet with Cassidy.  Unaware of his lies and believing

he was dying of cancer, she invited him to her retreat in Arizona.  *Id.*  During the first meeting,

Cassidy told her "I want you to know one thing.  I will never hit you.  I will never leave you."

*Id.* Almost immediately following this initial meeting, he asked her to marry him.  Victim 1

declined the proposal.  Cassidy asked that they pretend to be married and he sent her a ring.

(Exhibit A, ¶6(b)).

        While living at the retreat, Cassidy was privy to private and intimate details of Victim 1's

past, including details of her marriage and that she was sexually abused as a child.  Upon hearing

stories of her marriage, Cassidy asked if she wanted him to kill her ex-husband.  Shocked,

Victim 1 instructed him not to harm her ex-husband.  *Id.*

        Eventually Cassidy's ruse was unveiled.  Victim 1 confronted him with his lies and he

immediately left the retreat and began blogging and sending messages on Twitter directed at

Victim 1.  (Exhibit, ¶6(e)).  Cassidy posted just short of ***eight thousand tweets***, all of which

contained threatening, harassing and intimidating content. (*See* Exhibit A¶9-236).  We will not

unnecessarily re-produce the numerous explicit and implicit threats listed in the Affidavit, but

will note the amount of tweets and blogs, and the substance therein, clearly demonstrate a

specific intent to harass and stalk Victim 1.  His actions were not petty, isolated or sporadic, but

rather egregious and malicious.  As a result, Victim 1 has suffered substantial emotional distress.

Also important to note is Cassidy's violent criminal history.  He was convicted of the following:  Transporting a Dangerous Weapon Aboard an Aircraft (1993), Domestic Violence resulting in a traumatic condition (1996), Possession of a Firearm (1996), Arson 1st Degree and a Domestic Violence related Battery (2003).  (Exhibit A, ¶ 28).

Cassidy was indicted for violating the Interstate Stalking Act, 18 U.S.C. 2261(A)(2)(A) and 2261(A)(2)(B) (2006).  Section 2261(A)(2)(A) reads, in relevant part:

> Whoever, with the intent to kill, injure, harass, or place under surveillance with the intent to kill, injure harass, or intimidate, or cause substantial emotional distress to a person in another state … uses any interactive computer service, or facility of interstate commerce to engage in a course of conduct that causes substantial emotional distress to that person or places that person in reasonable fear of the death of that person … is guilty of a crime. (Exhibit, A¶5).

Cassidy moves this Court to dismiss the Indictment claiming the criminal statute in question – 18 U.S.C. § 2261A(2)(A)- is unconstitutionally vague and violates the First Amendment.   The Electronic Frontier Foundation filed an Amicus Curiae brief arguing these points.  Amici support the Government's Opposition and state the following in further support thereof:

II.     LEGAL ARGUMENT

    **a.     The Increased Need to Intervene Before Violence Occurs Has Led U.S. Congress (and majority of states) to Enact Legislation to Protect Victims of Cyberstalking**

Stalking is a crime that is frequently overlooked and often misunderstood..  However, it is a serious and dangerous problem in our society.  In a one-year period, 3.4 million people ages

18 or older in the United States were stalked.[2]  One in four stalking victims reported having been stalked through some form of technology, such as e-mail, instant messaging, or electronic monitoring.[3]  An analysis of 13 published studies of 1,155 stalking cases found that almost one-half the victims experienced violence connected to the stalking.[4]  When asked to name their worst fear related to the stalking, 46 percent of stalking victims reported not knowing what would happen next, and 29 percent reported fearing the stalking would never stop.[5]

Cyberstalking shares important characteristics with offline stalking.  Generally, stalkers are motivated by a desire to exert control over their victims and engage in similar types of behavior to accomplish this end.  In many cases, the cyberstalker and the victim had a prior relationship and the cyberstalking began when the victim attempted to break off the relationship.[6]  Cyberstalking may not involve physical contact with the victim but it should never be assumed it is more benign than physical stalking.  As with physical stalking, online harassment may be a prelude to physical violence.  Moreover, as the Internet remains an integral part of our daily lives, it is extremely important that cyberstalking statutes are enforced.  Stalking causes significant emotional distress, not just to the direct victims of stalking, but also to the families of the victims.[7]

---

[2]  Katrina Baum, Shannan Catalano, Michael Rand, and Kristina Rose, "Stalking Victimization in the United States," (Washington, DC: Bureau of Justice Statistics, 2009), 1, calculated from data on p. 2, http://www.ovw.usdoj.gov/docs/stalking-victimization.pdf (accessed October 6, 2010).
[3]  Ibid., 5.

[4]  Barry Rosenfeld, "Violence Risk Factors in Stalking and Obsessional Harassment," *Criminal Justice and Behavior* 31 (2004): 9.

[5]  Jeffrey J. Haugaard and Lisa G. Seri, "Stalking and Other Forms of Intrusive Contact after the Dissolution of Adolescent Dating or Romantic Relationships," *Violence and Victims* 18 (2004): 6-7.

[6]  *Stalking in America: The National Violence Against Women Survey*, Tjaden and Thoennes; (documenting the danger of separation violence by asking women who had been stalked by their former husbands or partners at what point in the course of the relationship the stalking had occurred. Twenty- one percent of the victims said the stalking occurred only before the relationship ended; 43 percent said it occurred only after the relationship ended; and 36 percent said it occurred both before and after the relationship ended. Callie Marie Rennison and Sarah Welchans, in "Special Report: Intimate Partner Violence," with results drawn from the *National Crime Victimization Survey*, also found that divorced or separated persons were subjected to the highest rates of intimate partner victimization.

[7]  *See* United States v. Nagel, 2011 U.S. Dist. Lexis 101311 *5;  *See also*, Tjaden and Thoennes, *Stalking in America: Findings From the National Violence Against Women Survey*. National Institute of Justice, 1998, NCJ 169592.U.S.(56% of women stalked took some type of self-protective measure, often as drastic as relocating (11%). 26% of stalking victims lost time from work as a result of their victimization, and 7%

Harassment statutes surfaced approximately one century ago when state and federal legislation emerged to criminalize telephone harassment. *See* Andrea J. Robinson, *Note, A Remedial Approach to Harassment*, 70 Va.L.Rev. 507, 524 (1984). California passed the first criminal stalking law in 1990 after several victims were stalked and murdered, one being actress Rebecca Schaeffer. By 1999, all fifty states followed and passed stalking statutes. *See* Robert A. Guy, Jr., *The Nature and Constitutionality of Stalking Laws*, 46 Vand. L. Rev. 991 (1993).

In 1996, Congress passed the Interstate Stalking and Prevention Act to combat stalking. Since its passage, it was amended twice. Initially there were three elements to the federal stalking law, (1) defendant crossed state lines (2) intentionally engaged in a course of conduct using mail or any other type of facility of interstate commerce or foreign commerce (3) that placed a person in fear of death or serious bodily injury.

With the release of the 1998 National Violence Against Women Survey (Exhibit B, 1999 *Report on Cyberstalking: A New Challenge for Law Enforcement and Industry*, A Report from the Attorney General to the Vice President) and the 2000 Sexual Victimization of College Women, stalking was placed on the radar and noted as an area which needed immediate attention. Presented with data evidencing a lack of federal law to protect cyberstalking victims, Congress took action. In 2000, Congress changed the jurisdiction of the Interstate Stalking and Prevention Act from one who physically "travels across state lines" to one who "travels in interstate commerce or foreign commerce." Since this amendment, there has been one published opinion where a defendant was convicted of interstate cyberstalking over the Internet. *United States v. Bowker*, 372 F.3d 365 (6th Cir. 2004). As the Government clearly set forth in its

never returned to work; 30% of female victims and 20% of male victims sought psychological counseling. *Id.* The prevalence of anxiety, insomnia, social dysfunction, and severe depression is much higher among stalking victims than the general population, especially if the stalking involves being followed or having one's property destroyed. Tjaden & Thoennes. (1998); The Toll of Stalking," *Journal of Interpersonal Violence*

Opposition, the *Bowker* court decided exact issues Cassidy presents today. (*Opposition to Defendant's Motions to Dismiss Indictment, For Franks Hearing and to Suppress Evidence*, at pgs. 23-27, 29). In 2006, with the passage of the Violence Against Women Act, Congress added the terms an "interactive computer service"[8] that causes "substantial harm." Clearly such amendments provide this Court with guidance as to the Congressional intent to broaden the definition of stalking to allow the criminal justice system to intervene before stalking escalates causing additional psychological injury, or worse, escalates into violence. And this case exemplifies the need for such intervention.

b.      **This Court's Ruling Will Impact the Ability of Law Enforcement to Protect Victims of Interstate Cyberstalking**

This Court's decision will create the record and ruling that will set the parameters of subsequent judicial review of 18 U.S.C. 2261(A)(2)(A). Given the growing numbers of cyberstalking cases in this Country, this Court's decision will help determine whether this particular class of stalkers will be held criminally liable and their victims protected under the law.

**CONCLUSION**

As state herein, the National Center for Victims of Crime and the Maryland Crime Victim's Resource Center, as Amici Curiae, urge this Court to deny Defendant Cassidy's motion to dismiss the Indictment and rule 18 U.S.C. 2261(A)(2)(A) is constitutionally valid to further to protect victims of interstate cyberstalking.

---

[8] In its Amicus brief, Electronic Frontier Foundation Amicus brief mischaracterizes NCVC's former executive director Mary Lou Leary's testimony to Congress. Ms. Leary testified that the use of "interactive computer service" would include the use of GPS devices to stalk victims. In her statement she did not limit the definition of an interactive computer service to GPS, but merely used it as an example of the misuse of technology to stalk a victim.

Respectfully Submitted,

NATIONAL CENTER FOR VICTIMS OF CRIME

MARYLAND CRIME VICTIMS' RESOURCE CENTER, INC.

By counsel,


_____


Stephanie Morris

2000 M Street, NW

Suite 480

Washington, DC 20036

Phone:(202) 467-8700

Facsimile: (202) 467-8701


_____


Russell P. Butler


_____


Bridgette Harwood

Maryland Crime Victims' Resource Center

1001 Prince George's Blvd., Ste 750

Upper Marlboro, MD 20774

Phone: (301) 952-0063

Facsimile: (240) 929-0526