IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA     \*

    \*

        v.                \*    Criminal Case No. RWT 11-091

    \*

WILLIAM LAWRENCE CASSIDY     \*

    \*

      Defendant       \*

## **MEMORANDUM OPINION**

The Indictment in this case alleges that the Defendant, William Lawrence Cassidy, violated a federal stalking statute, 18 U.S.C. § 2261A(2)(A), when, with the intent to harass and cause substantial emotional distress to a person in another state, he used an interactive computer service to engage in a course of conduct that caused substantial emotional distress to a person whose initials are A.Z by posting messages on www.Twitter.com and other Internet Websites. Defendant has filed a Motion to Dismiss the Indictment (ECF No. 20) in which he argues that 18 U.S.C. § 2261A(2)(A) violates the First Amendment. Defendant also filed a Motion Requesting a Hearing Pursuant to *Franks v. Delaware* and to Suppress Tangible and Derivative Evidence, as well as, a Motion to Suppress. *See* ECF Nos. 21 and 22. Finally, Defendant filed a Motion for a Bill of Particulars (ECF No.16).

FACTS

(a) Blogs and Twitter

This case involves allegations, described in greater detail below, that a crime was committed through the Defendant's use of two recent phenomena of the internet age, "Blogs" and "Twitter." Essential to the analysis of the legal issues in this case is an understanding of both of these phenomena, which have become almost ubiquitous.

A "Blog" is a shorthand term for a "web log," i.e. a log or web page maintained on the World Wide Web.  A Blog is like a bulletin board and contains whatever material its sponsor decides to post.  It does not send messages, and there is no limitation on the length of statements that may be contained on a Blog.  Like a bulletin board, it does not communicate except to those who voluntarily choose to read what is posted on it.

According to its web page, "Twitter" is a "real-time information network that connects" users to the "latest information about what you find interesting. * * * At the heart of Twitter are small bursts of information called Tweets.  Each Tweet is 140 characters in length . . . ."[1] Twitter users may choose to "follow" other users.  If user No. 1 decides to "follow" user No. 2, Twitter messages (Tweets) posted by user No. 2 will show up on the home page of user No. 1 where they can be read.[2]

A Twitter user may choose to block someone, e.g., someone whose messages are deemed offensive, in which case the offending user will be unable to follow the offended user or add that user to his or her lists, and the blocked user's Tweets will not be delivered to the other user's home page. Twitter provides detailed instructions for blocking Tweets from another user as well as for "unfollowing" another user, i.e. blocking Tweets from a user that one used to follow.[3]

---

[1]*See About Twitter*, https://Twitter.com/about#about (last visited December 2, 2011).

[2]*See Twitter 101: How Should I Get Started Using Twitter*, https://support.Twitter.com/groups/31-Twitter-basics/topics/104-welcome-to-Twitter-support/articles/215585-Twitter-101-how-should-i-get-started-using-Twitter  and https://support.Twitter.com/groups/31-Twitter-basics/topics/108-finding-following-people/articles/14019-what-is-following (last visited December 2,  2011).

[3]*See How to Unfollow Users on Twitter*, https://support.Twitter.com/articles/117063-how-to-block-users-on-Twitter and  https://support.Twitter.com/articles/15355-how-to-unfollow-users-on-Twitter (last visited December 2, 2011).

A Direct Message ("DM") is a private message sent from one Twitter user to another, but such messages can only be sent to another user who is a "follower."  All Twitter users are provided with the ability to block other users, in which case one user cannot follow another and neither their "Tweets" nor their Direct Messages will be delivered.[4]

Because this case involves First Amendment issues, terms that were in use by citizens when the Bill of Rights was drafted may help in understanding the legal context of Blogs and Twitter. Suppose that a Colonist erects a bulletin board in the front yard of his home to post announcements that might be of interest to others and other Colonists do the same.  A Blog is like a bulletin board, except that it is erected in cyberspace rather than in one's front yard.  If one Colonist wants to see what is on another's bulletin board, he would need to walk over to his neighbor's yard and look at what is posted, or hire someone else to do so.  Now, one can inspect a neighbor's Blog by simply turning on a computer.

Twitter allows the bulletin board system to function so that what is posted on Colonist No. 1's bulletin board is automatically posted on Colonist No. 2's bulletin board for Colonist No. 2 to see.  The automatic postings from one Colonist to another can be turned on or off by the owners of the bulletin boards, but there is no mandatory aspect of postings on one Colonist's

---

[4]*See What is a Direct Message*, https://support.Twitter.com/articles/14606-what-is-a-direct-message-dm (last visited December 2, 2011).  There are also other forms of direct communication between Twitter users known as "@Replies" and "Mentions." As in the case of direct messages, a Twitter user has the ability to restrict the receipt of this form of communication.  "@Replies" will only be seen by user if they are following both the sender and recipient of the update.  "Mentions" will only be seen if they are posted by someone that the user is "following."  Finally, users with protected accounts can only send replies to people they have approved to follow them.  *See What are @Replies and Mentions*, http://support.Twitter.com/articles/14023-what-are-replies-and-mentions (last visited December 2, 2001).

bulletin board showing up on the other's.  It is entirely up to the two Colonists whether their bulletin boards will be interconnected in such a manner.

Blogs are of unlimited size in terms of content, but must be accessed one at a time.  Twitter is limited to 140 characters, but allows unlimited voluntary connectivity with other users.  That connectivity, however, is subject to change at the whim of a user who has the ability to "turn off" ("block" or "unfollow") communications from another user.

Whether couched in terms of the Internet or Colonial bulletin boards, there is one consistent aspect of both eras.  One does not have to walk over and look at another person's bulletin board; nor does one Blog or Twitter user have to see what is posted on another person's Blog or Twitter account.  This is in sharp contrast to a telephone call, letter or e-mail specifically addressed to and directed at another person, and that difference, as will be seen, is fundamental to the  First Amendment analysis in this case.

### (b) The Defendant's Relationship With A.Z.

This case was initiated by the filing of a criminal complaint issued on February 2, 2011 by a magistrate judge of this Court based upon an affidavit submitted to him by F.B.I. Special Agent Jessica A. Nye.  According to the Nye affidavit, A.Z. is an enthroned tulku or reincarnate master who was enthroned in 1988 as a reincarnate llama. (ECF No. 20-2) Following the enthronement ceremony, the Supreme Head of this particular Sect of Buddhism renamed the center where A.Z. taught as Kunzang Odsal Palyou Changchub Choling ("KPC" or the "Center").  KPC was designated as the Supreme Head's seat in the West, and A.Z. is believed by members of the KPC to be the only American-born female tulku.

According to Nye's affidavit, the Defendant, who was then known as William Sanderson, befriended one of the monks of the KPC in 2007; he claimed he was also a Buddhist American tulku and expressed an interest in meeting A.Z.  Those close to A.Z. encouraged her to meet with the Defendant.   Thereafter, A.Z. invited the Defendant to join her at her retreat in Arizona and Defendant asked to ride alone with her in her vehicle.  While in the vehicle, Defendant proposed to A.Z., and she declined.  He also asked her to pretend they were married.  A.Z. confided in the Defendant and shared details of her personal life, including the sexual abuse she endured as a child and particulars of the failed relationship with her ex-husband.  In response, Defendant asked A.Z. if she wanted him to kill her ex-husband, and A.Z. requested that her ex-husband not be harmed.

Nye's affidavit also alleges that when Defendant claimed to have Stage IV Lung Cancer, members of the KPC took care of him, as if these were his final days.  At that time, it came to light that the Defendant's real name was William Cassidy.  KPC members and A.Z. also began to notice that the Defendant's conduct was inconsistent with this Sect's teachings.  For example, he would gossip even though the Sect considers gossip offensive.  These incidents led A.Z. to investigate the Defendant's lineage in order to assess whether he was in fact a tulku.  Despite these concerns, however, KPC promoted Defendant in February 2008 to the position of Chief Operating Officer of KPC.  The Defendant only held this position for two weeks.  On February 23, 2008,  A.Z. learned that the Defendant was never a tulku and confronted him.  The Defendant immediately left the retreat, taking with him a Buddhist nun, Nydia Alexandra.[5]  The Nye affidavit asserts that, in the wake of his departure, the Defendant used Twitter and Blogs to harass KPC and A.Z.

---

[5] Nydia Alexandra also goes by the names "Julie Green" and "Jewel Lilly Annabella."

<u>(c) The Defendant's Use of Twitter and a Blog</u>

According to the Nye affidavit, the Twitter account "Vajragurl" frequently posts Tweets. As of July 5, 2010, over 350 Tweets were posted on "Vajragurl" that allegedly were directed at A.Z. KPC believes that all but a few hundred of the alleged 8,000 Tweets on the "Vajragurl" account pertain to A.Z. and KPC.[6]

On November 12, 2010, and December 11, 2010, Twitter was served with a grand jury subpoena for the IP addresses accessing the "Vajragurl," "aconlamho," "kpc_watch," and other Twitter accounts.[7]  Some of these accounts are a slight variation of A.Z.'s name. On November 16, 2010, and December 16, 2010, Twitter responded that these accounts were accessed from IP Address 174.32.77.242, which is registered to Hughes Network.  On December 2, 2010, and January 5, 2011, Hughes Network responded to a subpoena identifying William Cassidy, the Defendant, as the subscriber.

KPC and A.Z. also claim that Defendant used Blogs to harass them.  According to the Nye Affidavit, a Blog entitled "Digitial Tibetan Buddhist Altar," located at http://tibetanalter.Blogspot.com, contains two posts not necessarily directed at A.Z.,[8] a statement

---

[6] Generally, the Tweets posted on the "Vajragurl" account fall into five categories: (1) threats directed at A.Z.; (2) criticism of A.Z. as a religious figure /criticism of KPC; (3) derogatory statements directed towards A.Z.; (4) responses to A.Z.  and/or KPC; and (5) statements that may or may not be directed towards A.Z./KPC.  Appendix A contains a categorization of the Defendant's Tweets by type.

[7] The other Twitter accounts  included "vajrawarrior," "alicezeoli," "zeoliayce," "alycezeoli," "MaliceZeholi," "tenparinpoche," "karmaKuchen," "PenorRinpoche," "femnikki," and "ahkonorbu."

[8] "Yes . . . beauty. A silver hammer on a hard head is beautiful, particularly if it is administered before one's funeral pyre catches blaze. Otherwise, one's head swells and explodes."

"Just for sake of example, lets pretend that once upon a time, you dreamed that somebody came

pertaining to A.Z.,[9] and a derogatory statement about KPC.[10]  On January 5, 2011, after receiving

subpoena results from both Google and the Hughes Network, the Government learned that this Blog

is registered to the Defendant.

According to the Nye affidavit, Defendant's Tweets and Blog postings have caused A.Z.

substantial emotional distress.  She fears for her own safety and that of her fellow KPC members.

As a result of the alleged harassment, A.Z. has not left her house for a year and a half, except to

see her psychiatrist.  A.Z. was in such fear for her safety that she did not go to an October 2010

retreat.

<u>(d) The Charge Against The Defendant</u>

On February 2, 2011, Nye submitted an affidavit (ECF No. 20-2) in support of an arrest

warrant for the Defendant on the basis that the Defendant violated 18 U.S.C §§ 2261A(2)(A) and

2261A(2)(B), and an arrest warrant was issued that same day.  On February 23, 2011, the Grand Jury

---

clump, clump, clumping up the stairs to your bedroom and did you an injury. . . Maybe it was
somebody you knew…The time, the body, and the circumstance no longer exist. This is to say
that the body which was injured in the dream no longer exists, the apparent attack itself no
longer exists, and the apparent attacker no longer exists. . . . The body which was attacked may
with equal validity only be claimed as extant for the precise moment of the attack. We may also
say that was the younger body, whereas now there is the older body."

[9] "This would be funny if it weren't so tragic. Back a couple of months ago, (A.Z.) (she calls
herself "(A.Z.)," and claims she is a "living Buddha") called police near her Barnesville,
Maryland home to report that, a "team of intruders" were observed "stalking the perimeter."
Nothing wrong with that—can't be too careful these days."

[10] "Whenever I hear about a Buddhist cult, I immediately want to investigate. It is like watching
hookers on the stroll. You never know when you'll find a really saucy one. Speaking personally,
one whistled at me a while back, and she came right over to the car. I made the mistake of rolling
down the window far enough for her to jump in. That led to my brief tenure as Chief Operating
Office of KPC in all its farflung permutations and front operations. So, while I may not be an
expert on Buddhist cults, at least I am entitled to an opinion, having examined one from the
inside out, so to speak."

indicted Defendant on one count of interstate stalking under 18 U.S.C. § 2261A(2)(A), but not § 2261A(2)(B).

DISCUSSION

I.  <u>Background of 2261A(2)(A)</u>

Section 2261A is an interstate stalking statute originally passed as part of the Violence against Women's Act.  *See* Pub. L. No. 104-201, Div. A, Title X, § 1069(a), 110 Stat. 2422, 2655 (1996).

Prior to 2006,  Section 2261A(2)(A) made it a crime, *inter alia*, to use the mail or any facility of interstate or foreign commerce to engage in a course of conduct with the intent to  place a person in reasonable fear of the death of, or serious bodily injury to that person.  The pre-2006 version of Section 2261A(2)(A) reads as follows:

> Whoever—
>     (2) with the intent—
>
>> (A) to kill or injure a person in another State or tribal jurisdiction or within the special maritime and territorial jurisdiction of the United States; or
>>
>> (B) to place a person in another State or tribal jurisdiction, or within the special maritime and territorial jurisdiction of the United States, in reasonable fear of the death of, or serious bodily injury to—
>>> (i) that person;
>>> (ii) a member of the immediate family (as defined in section 115) of that person; or
>>> (iii) a spouse or intimate partner of that person,
>
> uses the mail or any facility of interstate or foreign commerce to engage in a course of conduct that places that person in reasonable fear of the death of, or serious bodily injury to, any of the persons described in clauses (i) through (iii), shall be punished as provided in section 2261(b).

Pub. L. No. 106-386, Div. B, Title I, § 1107(b)(1), 114 Stat. 1464, 1498 (2000).

In 2006, Section 2261A(2)(A) was amended substantially and now reads as follows:

-8-

Whoever—
    (2) with the intent—

        (A) to kill, injure, **harass**, or place under surveillance with intent to kill, injure, harass, or intimidate, or **cause substantial emotional distress** to a person in another State or tribal jurisdiction or within the special maritime and territorial jurisdiction of the United States; or

        (B) to place a person in another State or tribal jurisdiction, or within the special maritime and territorial jurisdiction of the United States, in reasonable fear of the death of, or serious bodily injury to—
            (i) that person;
            (ii) a member of the immediate family (as defined in section 115 of that person; or
            (iii) a spouse or intimate partner of that person;

uses the mail, any **interactive computer service**, or any facility of interstate or foreign commerce to engage in a course of conduct that **causes substantial emotional distress** to that person or places that person in reasonable fear of the death of, or serious bodily injury to, any of the persons described in clauses (i) through (iii) of subparagraph (B) shall be punished as provided in Section 2261(b). (emphasis added)

Pub. L. No. 109-162, Title I, § 114(a), 119 Stat. 2690, 2987.

These amendments significantly broadened the scope of the law. The requisite *intent* no longer was limited to an intent to "kill or injure," but was broadened to include the intent to "harass or place under surveillance with the intent to . . . harass or intimidate or cause substantial emotional distress." The requisite *action* was also broadened so as to bring within the scope of the law a course of conduct that merely "causes substantial emotional distress." Prior to the 2006 change, the course of conduct was limited to one that places a person in reasonable fear of death or serious bodily injury. Finally, the 2006 changes expanded the *mechanisms of injury* to add use of an "interactive computer service" to the existing list which already included use of mail or any facility of interstate or foreign commerce.

## II.   The Defendant's Motion To Dismiss

The Defendant has moved to dismiss the Indictment, alleging that (1) Section 2261A(2)(A) violates the Free Speech Clause of the First Amendment because it is overbroad and implicates a broad range of otherwise constitutionally protected speech; (2) Section 2261A(2) is unconstitutional as applied to the Defendant; (3) Section 2261A(2)(A) is unconstitutionally vague, thus violating the Defendant's due process rights under the Fifth Amendment because it does not give notice as to what specific conduct is unlawful; and (4) the Indictment fails to state a criminal offense.

## III.   The Broad Protections Of The First Amendment

Under the First Amendment "Congress shall make no law… abridging the freedom of speech." U.S. Const. amend. I.  From our nation's founding, there has been a tradition of protecting anonymous speech, particularly anonymous political or religious speech.  *See Watchtower Bible & Tract Society v. Village of Stratton,* 536 U.S. 150, 162 (2002); *Lefkoe v. Jos. A. Bank Clothiers, Inc.*, 577 F.3d 240, 248 (4th Cir. 2009) ("Courts have typically protected anonymity under the First Amendment when claimed in connection with literary, religious, or political speech.") For example, the Federalist Papers, written by James Madison, Alexander Hamilton, and John Jay, but published under the pseudonym "Publius," are in and of themselves the best example of anonymous political speech.  *See McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 343 n.6 (1995).  And the opponents of the federalists, the anti-federalists, also used pseudonyms to publish their views anonymously. *Id*.  In 1960, the Supreme Court recognized the importance of this type of core anonymous speech stating that "leaflets, brochures and even books have played an important role in the progress of mankind [as] [p]ersecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all." *Talley v. California*, 362

U.S. 60, 65 (U.S. 1960).   This is because anonymous speech allows individuals to express themselves freely without "fear of economic or official retaliation ... [or] concern about social ostracism." *McIntyre*, 514 U.S. at 341-42.

Moreover, the First Amendment protects speech even when the subject or manner of expression is uncomfortable and challenges conventional religious beliefs, political attitudes or standards of good taste.   *See e.g., United States v. Stevens* 130 S.Ct. 1577, 1585 (2010).   In *Cantwell v. Connecticut*, 310 U.S. 296, 310 (1940), the Supreme Court overturned the conviction of three individuals for passing out religious leaflets in violation of a Connecticut statute that made it a crime to solicit and breach the peace and observed:

> In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy.

Indeed, the Supreme Court has consistently classified emotionally distressing or outrageous speech as protected, especially where that speech touches on matters of political, religious or public concern.   This is because "in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide 'adequate 'breathing space' to the freedoms protected by the First Amendment.'"   *See Boos v. Barry*, 485 U.S. 312, 322 (1988) (citing *Hustler Magazine, Inc. v. Faldwell*, 485 U.S. 46, 66 (1988));   *See also New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964); *Snyder v. Phelps*, 131 S.Ct. 1207, 1219 (2011) (Because the emotionally distressing "speech was at a public place on a matter of public concern, that speech is entitled to 'special protection'

-11-

under the First Amendment. Such speech cannot be restricted simply because it is upsetting or arouses contempt").

Even though the Internet is the newest medium for anonymous, uncomfortable expression touching on political or religious matters, online speech is equally protected under the First Amendment as there is "no basis for qualifying the level of First Amendment scrutiny that should be applied" to online speech. *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870 (1997). Indeed "whatever the challenges of applying the Constitution to ever-advancing technology, basic principles of freedom of speech and press, like the First Amendment's command, do not vary when a new and different medium for communication appears." *See Brown v. Entm't Merch. Ass'n*, 131 S. Ct. 2729, 2733 (2011) (internal quotations omitted).

<u>IV. Limitations On The Protections Afforded To Free Speech</u>

Even though numerous court decisions have made a point to protect anonymous, uncomfortable speech and extend that protection to the Internet, not all speech is protected speech. There are certain "well-defined and narrowly limited classes of speech" that remain unprotected by the First Amendment. *See Chaplinsky v. New Hampshire,* 315 U.S. 568, 571-572 (1942). This type of unprotected speech is limited to, (a) obscenity, *Roth v. United States*, 354 U.S. 476 (1957), (b) defamation, *Beauharnais v. Illinois*, 343 U.S. 250, 254-255, (1952), (c) fraud, *Virginia Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, (1976), (d) incitement, *Brandenburg v. Ohio*, 395 U.S. 444, 447-449 (1969) (*per curiam*), (e) true threats *Watts v. United States*, 394 U.S. 705 (1969), and (f) speech integral to criminal conduct, *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949). Speech that does not fall into these exceptions remains protected. *See United States v. Stevens*, 130 S.Ct. 1577, 1586 (2010) (holding that statute

criminalizing "depictions of animal cruelty" remain protected because there is no "freewheeling authority to declare new categories of speech outside the scope of the First Amendment.").

Applying these standards, it is clear that the Government's Indictment is directed at protected speech that is not exempted from protection by any of the recognized areas just described.  First, A.Z. is a well-known religious figure who goes by the names Alyce Zeoli or Catherine Burroughs. Martha Sherrill, a *Washington Post* journalist wrote a critical non-fiction book about A.Z. entitled *The Buddha from Brooklyn* (Random House 1st ed. 2000).   Second, although in bad taste, Mr. Cassidy's Tweets and Blog posts about A.Z. challenge her character and qualifications as a religious leader.  *See* Appendix A.  And, while Mr. Cassidy's speech may have inflicted substantial emotional distress, the Government's Indictment here is directed squarely at protected speech: anonymous, uncomfortable Internet speech addressing religious matters.   Tellingly, the Government's Indictment is not limited to categories of speech that fall outside of First Amendment protection – obscenity, fraud, defamation, true threats,[11] incitement or speech integral to criminal conduct.  Because this speech does not fall into any of the recognized exceptions, the speech remains protected.

## V.  Content-Based Restrictions On Speech

A content-based restriction on protected speech must survive strict scrutiny.  *See United States v. Playboy Entm't Grp., Inc*., 529 U.S. 803, 813 (2000).  But, if the regulation is "unrelated

---

[11] In its brief, the Government seems to shift its theory of the case from one based on emotional distress to one based on threats:  "Defendant in this case engaged in a continual course of conduct intended to threaten and intimidate A.Z. and KPC."  Opp'n. to Def.'s Mot. to Dismiss at 21 (ECF No. 27).  Although "true threats" to another's physical safety are not protected, *Watts v. United States*, 394 U.S. 705 (1969), the Government, did not seek an Indictment on the basis that Defendant intentionally used the Internet to put A.Z. in reasonable fear of death or serious bodily injury.  *See* 18 U.S.C. §2261A(2).

to the content of speech,"— i.e. content-neutral—it only need survive an intermediate level of scrutiny as these types of regulations "pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner Broad. Sys. Inc. v. Fed. Comm'cns Comm.*, 512 U.S. 622, 642 (1994).  In determining whether a statute is content-neutral, one must determine whether "the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  For example, "[a]s a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based," while laws that regulate "without reference to the ideas or views expressed are in most instances content-neutral." *Turner Broad. Sys.*, 512 U.S. at 643.

Typically, a restriction is content-based if it regulates speech based on the effect that speech has on an audience.  For example in *Playboy Entertainment Group*, the Supreme Court held that the Telecommunications Act's "signal bleed" provision, requiring cable operators either to scramble sexually explicit channels in full or limit programming on such channels to certain hours, amounted to a content-based restriction.  529 U.S. at 811-812.  The provision "single[d] out particular programming content for regulation" as well as "particular programmers," applying by its terms only to channels "primarily dedicated to sexually-oriented programming." 47 U.S.C. § 561(a) (1994 Supp. III.).  *Id*. at 806.  Because the provision focused only on the content of the speech and the direct impact that speech had on viewers, the provision was a content-based restriction.  *Id*. at 812, *see also Boos v. Barry*, 485 U.S. 312, 321 (1988) (holding that a Washington, DC regulation making it unlawful, within 500 feet of a foreign embassy, either to display any sign that tends to bring the foreign government into "public odium" or "public disrepute" amounts to a content-based speech restriction because it focuses on the direct impact of the speech on a foreign government);

*Reno v. Am. Civ. Liberties Union*, 521 U.S. 844, 877 (1997) (holding that Provisions of the Communications Decency Act (CDA) prohibiting transmission of obscene or indecent communications by means of a telecommunications device to persons under the age of 18, or sending patently offensive communications through use of interactive computer service to persons under the age of 18 is a content-based restriction on speech as it focuses on the impact of that speech); *PSINet Inc. v. Chapman*, 362 F.3d 227, 233 (4th Cir. 2004) (same).

In the present case, the only portion of Section 2261A(2)(A) mentioned in the Indictment amounts to a content-based restriction.  Section 2261A(2)(A) criminalizes anyone who:

> (2) with the intent—
>
> (A) to kill, injure, **harass**, or place under surveillance with intent to kill, injure, harass, or intimidate, **or cause substantial emotional distress to a person** in another State or tribal jurisdiction or within the special maritime and territorial jurisdiction of the United States... uses the mail, any interactive computer service, or any facility of interstate or foreign commerce to engage in a course of conduct that **causes substantial emotional distress to that person**... (emphasis added)

Mr. Cassidy allegedly violated the statute by intentionally causing substantial emotional distress to A.Z., specifically on Twitter and Blogs.  The portion of Section 2261A(2)(A) relied on in the Indictment amounts to a content-based restriction because it limits speech on the basis of whether that speech is emotionally distressing to A.Z.

To survive strict scrutiny, the Government has the burden of showing that a content-based restriction "is necessary to serve a compelling state interest." *See PSI Net*, 362 F.3d at 234 (citing *Bank v. Belotti* 435 U.S. 765 (1978)).  The Government indirectly argues that it has a compelling interest in protecting victims from emotional distress sustained through an interactive computer service.  *See* Pl Mot. to Dismiss Indictment at 23 (ECF No. 20).  However, the decision in *Playboy*

-15-

*Entertainment Group*, 529 U.S. at 865, underscores the fact that the Government's interest is not a compelling one:

> Where the designed benefit of a content-based speech restriction is to shield the sensibilities of listeners, the general rule is that the right of expression prevails, even where no less restrictive alternative exists. We are expected to protect our own sensibilities simply by averting [our] eyes.

Here, A.Z. had the ability to protect her "own sensibilities simply by averting" her eyes from the Defendant's Blog and not looking at, or blocking his Tweets.

In *United States v. Stevens*, the Supreme Court affirmed the Third Circuit's decision holding that a content-based restriction of protected speech — i.e. a federal statute that criminalized the intentional creation, sale or possession of a depiction of animal cruelty — did not serve a compelling state interest on the basis that these types of content-based restrictions of protected speech are presumptively invalid. 130 S.Ct. 1577, 1584 (2010).[12]   Because the Government's interest in criminalizing speech that inflicts emotional distress is not a compelling one, the statute does not survive strict scrutiny.

## VI.  Conduct Or Speech?

The Government argues that Section 2261A(2)(A) regulates conduct and not speech, and any impact on speech is incidental and content-neutral.  However, in *United States v. O'Brien*, 391 U.S. 367, 377 (1968), the Court stated that in situations where "'speech' and 'nonspeech' elements are combined in the same course of conduct" a government regulation must still pass

---

[12] *But see United States v. Lempley*, 573 F.2d 783, 787 (3d Cir. 1978) (stating that with respect to a statute that prohibits the intentional use of a telephone to harass and threaten, the "Congress had a compelling interest in the protection of innocent individuals from fear, abuse, or annoyance at the hand of persons who employ the telephone not to communicate, but for other unjustifiable motives.")  That case is inapposite because A.Z. had the ability to not look at the Defendant's Blog or his postings on Twitter.

intermediate scrutiny.  A content-neutral regulation of conduct that has an incidental impact on speech survives intermediate scrutiny if "'it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.'"  *See Satellite Broad. & Comm'cns Ass'n v. Fed. Comm'cns Comm.*, 275 F.3d 337, 355 (4th Cir. 2001) (citing *O'Brien*, 391 U.S. at 377).

Arguably, preventing the use of the Internet and other interactive computer services to inflict emotional distress on others serves an important governmental interest.  Indeed, by analogy, the Fourth Circuit has held that "the government has a strong and legitimate interest in preventing the harassment of individuals" in the context of a Virginia telephone harassment statute that prohibited the intentional use of the telephone to harass others.  *Thone v. Bailey*, 846 F.2d 241, 243 (4th Cir. 1988).

However, it is questionable whether the same interest exists in the context of the use of the Internet alleged in this case because harassing telephone calls "are targeted towards a particular victim and are received outside a public forum."  *United States v. Bowker*, 372 F.3d 365, 379 (6th Cir. 2004).  Twitter and Blogs are today's equivalent of a bulletin board that one is free to disregard, in contrast, for example, to e-mails or phone calls directed to a victim.  *See id.* at 378 (contrasting why a federal telephone harassment statute serves a compelling governmental interest and a statute that made it a criminal offense for three or more persons to assemble on a sidewalk and to be "annoying" to a passerby did not serve a compelling governmental interest).[13]

---

[13] No court analyzing Section 2261A(2)(A) has upheld the constitutionality of this statute when applied to situations implicating both the "interactive computer service element" and the "substantial emotional distress element."  For example, in *United States v. Bowker*, 372 F.3d 365 (6th Cir. 2004), the court upheld Section 2261A(2)(A), the case involed the pre-2006 version of

Assuming, however, that preventing the use of the Internet and other interactive computer services to inflict emotional distress on others qualifies as an important governmental interest, the issue here is whether the incidental restriction Section 2261A(2)(A) places upon speech is no greater than is essential to the furtherance of that interest.  The facts of this case indicate that it does not. Defendant and the Amicus, the Electronic Frontier Foundation, point out that A.Z. is not merely a private individual but rather an easily identifiable public figure that leads a religious sect, and that many of the Defendant's statements relate to KPC's beliefs and A.Z.'s qualifications as a leader.[14] Thus, this statute sweeps in the type of expression that the Supreme Court has consistently tried to protect.  *See e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254,  271 (1964) (the fundamental importance of the free flow of ideas and opinions on matters of public concern is the core of the First Amendment Protections, even where speech includes "vehement caustic and sometimes unpleasantly

---

the statute that did not sweep the use "of any interactive computer service . . . that causes substantial emotional distress" into the conduct element, or "intent to . . . cause substantial emotional distress" into the *mens rea* element.  Similarly, in *United States v. Shrader*, No. 09-270, 2010 WL 2179572 (S.D.W.Va April 7, 2010) *aff'd* No. 09-0270, 2010 WL 2179570 (S.D.W.Va, May 26, 2010) the court upheld the constitutionality of the statute.  Although *Shrader* relies on a post-2006 version of the statute, under the facts in *Shrader*, the defendant engaged in conduct that would have violated pre-2006 elements of the statute.  In *Shrader*, the defendant, who murdered his ex-girlfriend's mother, was charged under Section 2261A(2) for sending a letter and making frequent harassing telephone calls to his ex-girlfriend.  Unlike the Defendant's conduct in *Shrader*, Mr. Cassidy did not put his victim in the same reasonable fear of death or serious bodily injury and was not indicted under this portion of the statute. Moreover, in contrast to telephone calls, or letters which were directed to a specific person in *Shrader*, Mr. Cassidy's Tweets and Blogs existed in cyberspace and the victim was free to ignore them.

[14] The Amicus, the Electronic Frontier Foundation, points out that A.Z. leads an "an ongoing public conversation on religion, addressing Internet users on a frequent basis from her own Verified Twitter account, which has 17,221 followers," "produced dozens of publicly accessible online video teachings which have been viewed over 143,000 times," and "makes her public teachings available to her followers through the Buddhist KPC website which she founded."  Br. of Amicus Curiae in Supp. of Def., (ECF No. 24) at 8.

sharp attacks."); *Boos v. Barry*, 485 U.S. 312, 322 (1988) (refusing to uphold a statute that restricted the use of displays critical of foreign governments in front of embassies or consulates in light of a "longstanding refusal to [punish speech] because the speech in question might have an emotional impact on its audience." ).

Indeed, the Government does not suggest that its interest in preventing the use of the Internet and other interactive computer services to inflict emotional distress on others would no longer be furthered if the statute did not apply to individuals engaging in political debates or critiques of religious leaders. *C.f. United States v. Popa*, 187 F.3d 672, 677 (D.C. Cir. 1999) (holding that a criminal statute prohibiting making anonymous phone calls with the intent to annoy could have been more narrowly drafted as applied to a defendant, who made calls to the US Attorney's Office containing racial epithets and complaints about police brutality, without loss of utility to the government by excluding individuals engaging in public or political discourse). Notably, the Government never challenges the notion that Defendant's Tweets and Blog postings are not political or religious in nature.

## VII.   Facial Validity Of Section 2261A(2)(A)

Although the Defendant and the Government extensively briefed the issue of whether Section 2261A(2)(A) is overbroad or void for vagueness, this Court will not address these facial challenges to the statute because the Court concludes that the statute is invalid as applied. Where courts have found a statute to be unconstitutional as applied, they do not generally reach facial challenges to statutes based on overbreadth or vagueness. For example, in *United States v. Popa*, the court found unconstitutional, as applied, a federal telephone statute that prohibited making anonymous telephone calls with the intent to annoy abuse or harass to a defendant who used the

phone to call the U.S. Attorney's office and communicate racial epithets and complaints about police brutality. 187 F.3d 672, 678 (D.C. Cir. 1999). Applying intermediate scrutiny, the court reasoned that the defendant engaged in a type of political speech, and the statute could have been more narrowly drafted to exclude such speech from prosecution. *Id.*

Even though the defendant in *United States v. Popa* also challenged the statute on its face under the overbreadth doctrine, the court explicitly decided not to address that issue, stating that "because the statute is unconstitutional as applied to [defendant's] conduct, we shall not go on to inquire as to whether the statute is overbroad." *Id.* Indeed, this approach is not unique. *See Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484-85 (1989) (holding that governmental restriction on commercial speech as applied to plaintiffs was unconstitutional and did not consider an overbreadth challenge, reasoning that "it is not the usual judicial practice . . . nor do we consider it generally desirable, to proceed to an overbreadth issue unnecessarily — that is before it is determined that the statute would be valid as applied.").[15]

---

[15] *See also Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 502 (1985) (invalidating statute regulating obscenity as applied to plaintiff but refusing to strike down statute in its entirety, reasoning "that a federal court should not extend its invalidation of a statute further than necessary to dispose of the case before it"); *United States v. Grace*, 461 U.S. 171, 175 (1983) (declining to invalidate a federal criminal statute on its face that prohibited demonstrations on the Supreme Court grounds and confining its holding to invalidate the statute as applied to the case at bar in which the challengers were picketing on the public sidewalks surrounding the building); *Commodity Trend Service, Inc., v. Commodity Futures Trading Comm'n.*, 149 F.3d 679, 689 n.5 (7th Cir. 1998) (noting that when considering an overbreadth challenge, it is a proper exercise of judicial restraint for courts to adjudicate as-applied challenges before facial ones in an effort to decide constitutional attacks on the narrowest possible grounds and to avoid reaching unnecessary constitutional issues); *Jacobsen v. Howard*, 109 F.3d 1268, 1275 (8th Cir. 1997) (holding that because the court concluded that criminal statutes were invalid as applied, it is appropriate not to consider the overbreadth issue).

-20-

In this case, the Court concludes that the statute is unconstitutional as applied, and thus it is unnecessary to address the parties' arguments as to whether the emotional distress via an interactive computer service portion of 28 U.S.C. § 2261A(2)(A) is facially invalid.

## CONCLUSION

For the reasons set forth above, the Court will, by separate Order, grant the Motion to Dismiss the Indictment and deny as moot all of the Defendant's remaining motions.


Date: <u>December 15, 2011</u>                    <u>            /s/                    </u>
                                                                Roger W. Titus
                                                                United States District Judge

# Appendix A

**Type 1: Threats**

Sunday, May 30, 2010: "ya like haiku? Here's one for ya: "Long, Limb, Sharp Saw, Hard Drop" ROFLMAO."[16]

Monday, July 5, 2010: "and that sound that keeps buzzing in the back of your head (A.Z.) is my hand touching the ground."

Tuesday, June 22, 2010: "want it to all be over soon sweetie?"

Saturday, September 25, 2010: "Enough is enough. The final bit of magic begins now. Within 90 days, you will know. Owl and raven feathers separate... permanently."[17]

Tuesday, October 19, 2010: "owl and raven feathers separate .... tick tock tick tock tick tock tick tock tick tock."

Tuesday, October 19, 2010: "owl and raven feathers separate .... tick tock tick tock tick tock"

Sunday, October 24, 2010: "Rain tomorrow should cover the tracks…"

Tuesday, December 7, 2010: "Got a wonderful Pearl Harbor Day surprise for KPC ....wait for it."

Wednesday, December 8, 2010: "@WuTangTulku '(A.Z.)' sees Tenpa Rinpoche every time she closes her eyes. He is everywhere."

Thursday, December 9, 2010: "(A.Z.) is over 60, in extremely bad health, and about to get worse: karma will be very rough on her due to conditions she has created."

Thursday, December 9, 2010: "Terrors in the night disturb Fat (A.Z.)'s sleep: she cannot sleep with taking something, and anxiety rules her body like a slavemaster."

---

[16] ROLFMAO is Internet slang for Rolling on Floor Laughing My A** Off.

[17] Owl and raven feathers separate" refers to a specific tantric magical invocation to "separate" (i.e., remove) the defenses of the enemy so that the enemy is then left defenseless against attack. This probably stems from the ancient belief in many aboriginal cultures that owls and ravens represent the two poles of"good" and "evil", based on white owl feathers and black raven feathers seen as symbols of polar opposites. Owl and raven feathers are also symbols of various protector deities in Vajrayana Buddhism.  *See* http://protectingnyingma2.wordpress.comJpage/2/

<u>Thursday, December 9, 2010</u>: "A thousand voices callout to (A.Z.) and she cannot shut off the silent scream."

<u>Monday, December 20, 2010</u>: "I have this *amazing* present for a group of people who really, really deserve something *amazing*. Long time in preparation. Wait for it."

<u>Monday, December 20, 2010</u>: "I have a really *special* eclipse present for somebody who really, really deserves something *special.* Full circle karma. Wait for it."

<u>Monday, December 20, 2010</u>: "RT @religionnews: Former cult member murdered in Texas: http://bit .ly/h2P6S8#religion #cults"

<u>Friday, May 28, 2010</u>: "Last night I had a dream about Seems something sudden..."[18]

<u>Friday, May 28, 2010</u>: ". . . something suddenly happened."[19]

<u>Friday, May 28, 2010</u>: "Damn! I just heard more screams coming from the compound! Hope everything is OK! Worried!"[20]

## Type 2: Criticism of A.Z. as a Religious Figure and/or Criticism of KPC Belief System

<u>Sunday, May 30, 2010</u>: "(A.Z.) is a demonic force who tries to destroy Buddhism"

<u>Monday, June 7, 2010</u>: "may the legion of dakinis[21] trample on the false guide (A.Z.)'s head and bring her to her knees in submission to pure lineage."

<u>Monday, June 7, 2010</u>: "if she leaves rainbow[22] I'll recant my words but all she'll ever leave is a [sic] shit stain on the [sic] sheets & another lying cover-up by her [sic] cult of fools"

<u>Friday, June 25, 2010</u>: "(A.Z.) you are a liar & a fraud & you corrupt Buddhism by your very presence: go kill yourself."

---

[18] From Twitter account kpc_watch.

[19] From Twitter account kpc_watch.

[20] From Twitter account kpc_watch.

[21] Dakini is a goddess.

[22] In the Tibetan Buddhist tradition, miraculous signs, such as rainbows may follow an accomplished Master's death.  (Affidavit)

<u>Friday, July 9, 2010</u>: "(A.Z.) is no dakini: shes a grossly overweight 61 yr old burnt out freak with bad bowels & a lousy outlook: her "crown" is a joke."

<u>Tuesday, July 13, 2010</u>: "attendees at NY Palyul annual retreat being told to avoid (A.Z.): being warned that she is "delusional!" Just finding that out?"

<u>Wednesday, October 20, 2010</u>: "The memory of Penor Rinpoche[23] in America has been DISGRACED by (A.Z.) and Steven Seagal. All the spin in the world cannot change that."

<u>Monday, October 25, 2010</u>: "(A.Z.) is OBSESSED with Tenpa Rinpoche[24] because he knows ALL her dirty little secrets: she lives in fear of being outed by him."

<u>Monday, October 25, 2010</u>: "(A.Z.)'s livelihood:" uneducated bitch makes her living off suckers who need to believe in fairy tales."

<u>Wednesday, November 11, 2010</u>: "(A.Z.) IS A SATANIC CORRUPTER OF DHARMA: A SHE-DEMON WHO MASQUERADES AS A "TEACHER" http://tinyurl.com/2fy21nd"

<u>Thursday, December 2, 2010</u>: "because that delusive belief set of hers forms the rationale for all her craziness: wow! one name must ring in her ears nite & day".

<u>Sunday, December 5, 2010</u>: "To call an overweight whore "mother of palyul" insults whores & palyul."

<u>Sunday, December 5, 2010</u>: "Watch (A.Z.) and KPC decompose."

<u>Wednesday, December 8, 2010</u>: "A LA LA HO! so keep on shoutin & sweatin (A.Z.) & showin us all yer credentials & tellin us how very fucking high you are."

<u>Thursday, December 9, 2010</u>: "A strong wind @ryderjaphy will blow down the KPC house of cards once and for all. They live by extortion now, and they live hand to mouth."

<u>Monday, December 20, 2010</u>: "Some people really react badly 2 the screams of their victims So annoying Such people are called sociopaths A group of them is called 'KPC.'"

---

[23] Penor Rinpoche is a religious leader of the Sect.

[24] Tenpa Rinpoche refers to the Defendant.

<u>Tuesday, December 28, 2010</u>: "DOWN WITH KPC! The fascist insect that preys on the life of Buddhism in the West! DOWN WITH (Victim I)! The corrupt poser who has nothing."

<u>Thursday, December 30, 2010</u>: "Warning to KPC cult followers: your leader has become even more unstable. #dontdrinkthekoolaid She is clearly in psychic distress."

<u>Thursday, December 30, 2010</u>: "2011 looks cursed for (A.Z.) & KPC ☹ (A.Z.) May all beings benefit! http://bit.ly/fSCcoa"

## Type 3: Derogatory Statements Directed Towards A.Z.

*Subpart A: Vulgarity*
>   <u>Friday, June 4, 2010</u>: "(A.Z.): somebody throw a couple shots of gin in the bitch & get her back on Twitter: shes fun 2 play with."[25]
>
>   <u>Monday, July 5, 2010:</u> "Dedicate the merit & so forth ... & a hearty fuck you in the general direction of Maryland."
>
>   <u>Thursday, August 19, 2010</u>: "hey! great idea! Go save the dogs in Maryland! I know where there are some bitches that desperately need mental health care . . ."

*Subpart B: Criticism of Looks*
>   <u>Wednesday, July 14, 2010</u>: "ho bitch (A.Z.) so ugly that when she was born the doctor slapped her mother #hobitch (A.Z.)"
>
>   <u>Wednesday, July 14, 2010</u>: "that ho bitch (A.Z.) so fat if she falls & breaks her leg gravy will spill out."
>
>   <u>Wednesday, July 14, 2010</u>: "that ho bitch (A.Z.) so nasty her mama took her out on the stroll so she wouldn't have to kiss her goodbye."

*Subpart C: Encouraging A.Z. to Commit Suicide*
>   <u>Sunday, July 25, 2010</u>: "I have just one thing I want to say to (A.Z.), and its form the heart: do the world a favor and go kill yourself. P.S. Have a nice day."
>
>   <u>Sunday, July 25, 2010</u>: "(A.Z.) you called me a "sick low life pig" oh great Mandarava? Go kill yourself."

---

[25] This tweet occurred immediately after A.Z. closed her Twitter account and deleted her name. (Affidavit)

*Subpart D: Sexually Explicit*

<u>Monday, October 25, 2010</u>: "city girls use Vaseline, country girls use lard, fat (A.Z.) don't use nothing,' she gets it twice as . . . "

<u>Sunday, December 5, 2010</u>: "I do not believe (A.Z.) was a prostitute. I think that story is a made-up lie Prostitutes are professionals."

<u>Sunday, December 5, 2010</u>: "Can reputed ex-prostitute (A.Z.) weather the storm she has created for herself by obsessive online bullying & cyberstalking?"

<u>Sunday, May 23, 2010</u>: "what do you expect from the unwanted daughter of a weekend prostitute?"[26]

<u>Sunday, May 23, 2010</u>: "(A.Z.) is like a waterfront whore: her price goes down as the night wears on."[27]

*Subpart E: Regarding A.Z.'s Personality*

<u>Thursday, December 2, 2010</u>: "(A.Z.), if you don't like the results of your actions, try a new approach: stop your hate, fear, insecurity, and greed: STFU&STFD)."

<u>Wednesday, December 8, 2010</u>: "it ain't cause yer a woman (A.Z.) & it sure aint jealousy. you got that all wrong. its because yer a fucking hypocrite from way down the road."

<u>Sunday, May 23, 2010</u>: "(A.Z.)'s attendants say she shits the bed regularly and pisses it when she's drunk: at the moment of death such events are quite telling."[28]

## Type 4: Responses to A.Z. and/or KPC

<u>Sunday, July 25, 2010</u>: "(A.Z.) you called me a "sick low life pig" oh great Mandarava? Go kill yourself."

<u>Tuesday, November 30, 2010</u>: "@(A.Z.) sure hope you weren't referring to me as a felon, bitch, because as I'm sure your lawyer has informed you that could cost U money."

<u>Thursday, December 2, 2010</u>: "yet still the bitch maintains hate sites, uses anonymous avatars to do her dirty work and pretends to herself we don't see right through her"

---

[26]  From Twitter account kpc_watch.

[27]  From Twitter account kpc_watch.

[28]  From Twitter account kpc_watch.

Thursday, December 16, 2010: "@ryderjaphy @waylonlewis @elephantjournal first off, these KPC punks got nothing, so fuck their "legal" threats."

**Type 5: Statements not necessarily directed towards A.Z.**

Tuesday, October 19, 2010: "One name rings inside her head . . . over and over again . . . she can't get it out of her mind ... it comes to her every "practice" session . . . ."

Tuesday, October 19, 2010: "That name rings in her head a thousand times each day ..... "

Tuesday, October 19, 2010: "hey! who left the light on in the barn!"

Tuesday, October 19, 2010: "all for you . . . all for you . . . ."

Tuesday, October 19, 2010: "just for you . . . ."

Wednesday, October 20, 2010: "(A.Z.) I will sign off a bit early. Tomorrow is a big day, I'd like to be rested I will break retreat temporarily for important meetings"

Sunday, October 24, 2010: "But for tonight? Was that a noise in the trees? Is that a light? No, not there... over there!"

Wednesday, December 8, 2010: "because everybody knows that grabbing nickels tossed by crowds into your tambourine is what you do best . . . ."

Wednesday, December 8, 2010: "which pretty much makes Tenpa the Baddest Motherfucker With Blue Eyes on the face of the planet . . . because if what they say is true . . ."

Thursday, December,16, 2010: "So my unsolicited advice which I claim the right 2 give on grounds of being an obnoxious bitch is pop the fucking weasel & full speed ahead."

Thursday, May 13, 2010: "late at night at the edge da farm, somethin creepin in the woods gonna do ya harm all ya gots 2 do 2 make it go away is pay pay pay pay."[29]

---

[29] From Twitter account "aconlamho."